**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

RONALD SAINTIL,

            Plaintiff,

v.

BOROUGH OF CARTERET, BOROUGH
OF CARTERET POLICE DEPARTMENT,
TOWNSHIP OF HAMILTON, TOWNSHIP
OF HAMILTON POLICE DEPARTMENT,
ET AL.,

            Defendants.

Civil Action No. 17-00433 (FLW)

**OPINION**

Plaintiff Ronald Saintil ("Plaintiff") filed this suit against various municipalities and individual law enforcement officers for alleged violations of his constitutional and civil rights under 42 U.S.C § 1983 and the New Jersey Civil Rights Act (N.J.S.A. 10:6-1 *et seq*.), and for alleged violations of state tort laws under the New Jersey Tort Claims Act (N.J.S.A. 59:8-1, *et seq*.), from January 30, 2015 to February 9, 2015, in connection with a homicide investigation that occurred.  Pending before the Court are three motions for summary judgment, filed by three separate groups of defendants (collectively "Defendants"): (i) the "Carteret Defendants," including the Borough of Carteret, the Borough of Carteret Police Department, Carteret Police Chief John Pieczyski, Det. Thomas O'Connor, Det. Lt. Robert Wargocki, and Borough of Carteret Police Officers 1-10; (ii) the Middlesex County Prosecutor's Office (or "MCPO") Defendants, including Sgt. James Napp, Det. Gregory Morris, Sgt. Scott Crocco;  and MCPO Detectives John Does 1-10; and (iii) the "Hamilton Defendants," including the Township of Hamilton, the Township of Hamilton Police Department, Hamilton Police Chief James Collins, Sgt. Kyle Thornton, Sgt. Terry

King, Det. Lt. Joseph Mastropolo, Officer Christopher DiMeo, Officer Jonathan Woodhead, Officer Christopher Schuster, Officer David DeLeon, Officer Chester Embley, Officer David H. Leonard, Officer Mark Horan, Officer Patrick R. Guido, Officer William P. Murphy, Officer James M. Stevens, Officer Sean B. Mattis, Officer Leonard J. Gadsby, and Hamilton Township Police Officers John Does 1-10.

For the reasons set forth below, the Court **GRANTS** the motions for summary judgment in full.  Plaintiff's claims are dismissed.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

To resolve these motions for summary judgment, the facts recounted here are largely undisputed.  Disputes as to the timing, circumstances, or characterizations of certain events are noted for clarity where necessary and appropriate.

### A.  The Murder of Anthony Mocci and the Initial Homicide Investigation

On the morning of January 30, 2015, the Middlesex County Prosecutor's Office ("MCPO") and the Carteret Police Department responded to 76 Essex Street in Carteret, New Jersey after having received a call from Adison Trigueno explaining that he had discovered his employer, Anthony Mocci, unresponsive at the location.  ECF No. 116-1, Carteret Defendants' Statement of Material Facts ("Carteret Facts") ¶ 1.  When law enforcement arrived, Mocci was found face down in a pool of blood and pronounced dead at the scene.  ECF No. 122-2, MCPO Defendants' Statement of Material Facts ("MCPO Facts") ¶ 2.   A murder investigation ensued in which Det. Andreea Capraru (formerly "Zebib") served as the lead investigator from the MCPO, with the assistance of Det. Greg Morris, and Det. Thomas O'Connor, who served as the lead investigator for the Borough of Carteret.  MCPO Sgt. Scott Crocco supervised the investigation.  Carteret Facts ¶ 3.

That same day, the investigative team conducted interviews of certain individuals deemed to have potentially relevant information, including Adison Trigueno, Jacklyn Cruz, Ronald Ozechowski, and Lisa Mocci.  Carteret Facts ¶ 4.  Adison Trigueno, who had been employed by Mocci, gave a formal statement to Det. Zebib and Det. O'Connor at the Carteret Police Department, which stated, among other things, that Mocci owed money to a man named Ronald (later confirmed to be Ronald Saintil by the detectives) who had previously worked for him.  *Id.* ¶¶ 7–8.  Trigueno explained that any relationship between the two had soured, and that Mocci had once mentioned that if Ronald showed up to his house he would "leave in a body bag."  *Id.*; MCPO Facts ¶ 6, Ex. E.   Trigueno further stated that Ronald was Haitian, provided the detectives with his phone number, and stated that he drove a black Jeep Cherokee.  Carteret Facts ¶ 8–10; MCPO Facts ¶ 7, Ex. E.  Jacklyn Cruz, who lived next door to the crime scene and a tenant of Mocci, told the detectives in an interview that the previous evening, January 29, she noticed a black SUV that looked like a Jeep Cherokee on Essex Street near the address at which Mocci's body was found.  Carteret Facts ¶ 5; MCPO Facts ¶ 4.

Around 5:00 p.m., the detectives conducted a motor vehicle records check, which confirmed that a 1999 black Jeep Grand Cherokee was registered to Ronald Saintil.  Carteret Facts ¶ 12; MCPO Facts ¶ 8.  With this information, Saintil became a person of interest in the homicide investigation, and the investigative team, including Sgt. Crocco, Det. Zebib, Det. Morris, Det. O'Connor, and Lt. Wargocki, drove to Saintil's residence in Hamilton Township to conduct an interview.  Carteret Facts ¶ 13; MCPO Facts ¶ 9.

### B.  Saintil's Arrest and the Search of His Residence

#### i.  *Law Enforcement's Initial Attempt to Interview Saintil*

At approximately 7:30 p.m., on January 30, 2015, the Carteret and MCPO detectives arrived at Plaintiff's residence.  Carteret Facts ¶ 14.  The Hamilton Police Department had been informed of the investigation and potential interview, and Hamilton officers arrived at Plaintiff's residence around the same time as the detectives.  MCPO Facts ¶ 10.  At some point shortly after law enforcement arrived at the residence, all of the lights inside the residence were turned off.  Carteret Facts ¶ 16; MCPO Facts ¶ 11.  A 1999 black Jeep Grand Cherokee was parked outside.  Carteret Facts ¶ 15.  Sgt. Crocco knocked on the front door of the residence[1] and at least one officer announced the presence of law enforcement.  Carteret Facts ¶ 17, 18.  Looking out his window, Plaintiff saw several men outside the front door,[2] but did not answer.  Pl Facts ¶ 32.  At 7:35 p.m., Sgt. Crocco attempted to make contact with Plaintiff by calling his cell phone, but likewise received no answer.  Carteret Facts ¶ 27.

After receiving no response to the initial knock, Det. O'Connor and Lt. Wargocki walked to the back of residence.  Carteret Facts ¶ 20; MCPO Facts ¶ 12.  Having heard voices toward the rear of his apartment, Plaintiff proceeded to his bedroom window and observed Det. O'Connor outside the window.  Pl. Facts ¶ 34.  Det. O'Connor similarly observed Plaintiff at the window before Plaintiff ultimately retreated into the living room area of the apartment.  Carteret Facts ¶ 23; MCPO Facts ¶ 14.

---

[1] Plaintiff asserts that the front door of the residence upon which Sgt. Crocco knocked is an outer, common entry doorway to an apartment building.  ECF No. 144-3, Plaintiff's Amended Statement of Undisputed Material Facts ("Pl. Facts") ¶ 32.

[2] Plaintiff maintains that the detectives and officers he saw were in plain clothes and arrived in unmarked cars. Pl. Facts. ¶¶ 29–34.  Defendants maintain that marked police vehicles and some uniformed officers were present on the scene.  McGuire Decl. Ex. H at 196:6–197:17.

The parties' version of events of what took place at Plaintiff's back window differ.  Plaintiff maintains that he merely looked through the window shade, that the window remained shut and locked, and that he never made any attempt to escape.  Pl. Facts ¶¶ 34–35.  On the other hand, Det. O'Connor claims to have seen Plaintiff with his hands and body positioned in a way that would indicate an effort to push out the window, which he believed evidenced a potential escape effort. Carteret Facts ¶ 22; MCPO Facts ¶ 16.

Immediately following this encounter, Det. O'Connor informed officers in the front of the residence, including Sgt. Crocco, that he had seen a black male seemingly attempt to exit the apartment through the back window, before returning to the apartment's interior. Carteret Facts ¶ 22; MCPO Facts ¶¶ 15, 17.  Officers had also heard Det. O'Connor yelling at someone in the back of the residence.  MCPO Facts ¶ 13.  Once back in his living room, phone records indicate that Plaintiff placed or received seven phone calls from his cellphone between 8:21 p.m. and 9:29 p.m. Carteret Facts ¶ 28.  Plaintiff remained unresponsive to the law enforcement officers' efforts to speak with him.

### ii.   *Sgt. Crocco Obtains Telephonic Warrant*

At approximately 8:28 p.m., Sgt. Crocco called the Court Smart Phone Line to apply for a warrant to search Plaintiff's residence.   Pl. Facts ¶ 37; Certification of David A. Schwartz ("Schwartz Cert."), Ex. 16.   Present on the line with Sgt. Crocco were Middlesex County Superior Court Judge John Jorgensen and Middlesex County Assistant Prosecutor Scott LaMountain, who is not named as a defendant in this suit.  *Id.*  Prior to the call, Sgt. Crocco had communicated with LaMountain about the homicide investigation, evidence gathered up to that point, and the situation at Plaintiff's residence.  MCPO Facts ¶ 18; McGuire Decl. Ex. A at 5.

Sgt. Crocco provided sworn testimony in support of the warrant, explaining the context of the homicide investigation and the preceding effort to make contact with Plaintiff.  Sgt. Crocco stated that Carteret Police had responded to 76 Essex Street that morning and discovered a deceased male, identified as Anthony Mocci.  *See* Schwartz Cert. Ex. 16.  He further explained that police had spoken to one of Mocci's employees, Adison Trigueno, who had found Mocci unresponsive at the residence.  *Id.*  Sgt. Crocco testified that Trigueno had given a sworn statement in which Trigueno said that the victim had an "ongoing dispute with an individual by the name of Ronald who had a heavy Haitian accent," and who was later identified as Ronald Saintil.  *Id.*  Sgt. Crocco further stated that law enforcement ascertained from Trigueno and Mocci's wife, Lisa Mocci, that Saintil was a former employee of Mocci who had been "fired 2 months ago."  *Id.*  Sgt. Crocco explained that as part of the "ongoing dispute" between Saintil and Mocci, "in the last several weeks Mr. Ronald Saintil showed up at the victim's residence in Colonia, New Jersey and a verbal argument ensued where death threats were made by both parties."  *Id.*   Sgt. Crocco also noted that Trigueno had stated that Saintil drove a 1999 black Jeep Grand Cherokee.  *Id.*  Sgt. Crocco continued by stating that law enforcement had taken a sworn statement from Mocci's friend Ron Ozechowski, who "confirmed of an ongoing dispute with the victim and this Mr. Ronald Saintil and confirmed that he drove a black vehicle. Black SUV."  *Id.*   Sgt. Crocco also recounted the statement of Jacklyn Cruz, "the resident at 78 Essex Street right next door to where the victim was murdered," who said that the night prior she observed a "black SUV with tinted windows," which "appeared to be a Jeep Cherokee," "pull up behind the victim's vehicle" and "park there for several minutes" before driving away "several minutes later."  *Id.*  Sgt. Crocco explained that based on this information "Ronald Saintil was a person of interest."  *Id.*  He also noted that law enforcement had confirmed that "Saintil owns a 1999 black Jeep Grand Cherokee"

and that law enforcement had obtained his "employment records with the company of Mr. Mocci." *Id.*

Sgt. Crocco then explained that law enforcement had responded to Saintil's residence that evening. *Id.* He stated that "when we pulled up we observed an individual look out the window" and that "[a]ll the lights were on in the residence." *Id.* But when law enforcement "knocked on the door" then "all the lights in the house went out." *Id.* Sgt. Crocco stated that "[t]wo officers went to the back of the residence and we continued to knock in the front with no answer." *Id.* Sgt. Crocco further testified that "the screen was pushed out the back window of that residence and black male was observed was attempting to come out that window. When the officers yelled at him, he immediately slammed the window down and pulled down the shade and went back inside that apartment." *Id.* Sgt. Crocco noted that law enforcement was "able to obtain a phone number from Mr. Saintil at which time we called that number," and that while they "could hear a phone ringing inside the apartment," ultimately "[t]here was no answer on that phone." *Id.* Sgt. Crocco summarized law enforcement's maintenance of visual surveillance of the apartment, noting that there was "a black male fitting the description of Ronald Saintil in that residence," and that the "1999 Jeep Grand Cherokee registered to Mr. Saintil was parked right in front of that residence." *Id.* Sgt. Crocco then requested a search warrant "for that entire apartment as well as the 1999 black Jeep Grand Cherokee." *Id.*

Finally, Sgt. Crocco stated that he had "been speaking with Assistant Prosecutor LaMountain," who also wanted "to charge this individual with hindering apprehension in this investigation." *Id.* LaMountain explained that hindering apprehension, under N.J.S.A 2C:29-

3b(2),[3] is a third-degree offense. *Id.* The Assistant Prosecutor further stated that while he did not have Saintil's criminal history in front of him, he believed that such history consisted of "just a drug charge."[4] *Id.* LaMountain also requested that Judge Jorgensen set bail at $100,000 "based on the fact that" Saintil is "the prime suspect in the homicide." *Id.* LaMountain noted that the bail "could be reviewed quickly," if the investigation did not lead any further with respect to Saintil. *Id.*

Based on this information, Judge Jorgensen approved both the requested search warrant and the charge for hindering apprehension, with bail set at $100,000. *Id.* Judge Jorgensen stated that he found probable cause for the search warrant "on the basis of the Sergeant's testimony" which recounted "information" from the "witness statements." *Id.* Judge Jorgensen also stated that he believed hindering apprehension was "an appropriate charge" and that, "in light of the fact there is an ongoing . . . homicide investigation" and Saintil was "the prime suspect," bail set at $100,000 was appropriate. *Id.*

Plaintiff disputes the veracity of certain details and statements made by Sgt. Crocco in support of the search warrant and hindering charge. First, Plaintiff notes evidence in the record indicating that his purported dispute with Mocci was not "ongoing," and that Trigueno had actually told law enforcement that the dispute "was quite a while ago, it really was a while ago." Pl. Facts ¶ 55; Schwartz Cert. Ex. 5 at 34:3–8. Second, Plaintiff notes that there is nothing explicit in the

---

[3] Saintil was ultimately charged under N.J.S.A 2C:29-3b(1), which prohibits hindering one's own apprehension through the destruction or concealment of evidence. Schwartz Cert. Ex. 17. N.J.S.A 2C:29-3b(2) prohibits hindering one's own apprehension by means of force or intimidation. While Assistant Prosecutor LaMountain offered to read Judge Jorgensen the precise elements of the hindering charge, Judge Jorgensen declined. Schwartz Cert. Ex. 16 at 6.

[4] Plaintiff's criminal history consisted not of a drug charge, but rather several arrests for domestic violence. Hamilton Facts ¶ 22; Schwartz Cert. Ex. 8 at 193:1-194:25.

record that the victim's wife, Lisa Mocci, provided Plaintiff's name to police in her statement made on January 30, 2015.  Pl. Facts ¶¶ 56–61.  Third, Plaintiff disputes Sgt. Crocco's statement that "in the last several weeks Mr. Ronald Saintil showed up at the victim's residence in Colonia, New Jersey and a verbal argument ensued where death threats were made by both parties toward each other," noting that such an encounter is not wholly supported by Trigueno's sworn statement to the police on January 30, 2015.  Pl. Facts ¶¶ 64–65.  Fourth, Plaintiff highlights that the investigative report summarizing Ron Ozechowski's statement to police does not support Sgt. Crocco's assertion that he "confirmed an ongoing dispute with the victim" and confirmed that Saintil "drove a black vehicle."  Pl. Facts ¶¶ 69–70; Schwarz Cert. Ex. 1 at 4, 14.  Fifth, Plaintiff points out that certain details as to Jacklyn Cruz's description of the black SUV she had seen on January 29 were not accurately relayed by Sgt. Crocco, including that on the vehicle she had seen "everything was tinted," unlike Saintil's vehicle which is only tinted in the rear windows, and that no one had come out of the vehicle she observed.  Pl. Facts ¶¶ 71–78; Schwartz Cert. Ex. 20 at 3:12-13, 15.  Sixth, Plaintiff notes that Sgt. Crocco had stated that he had obtained employment records for Saintil, but that in discovery Sgt. Crocco acknowledged that he had not obtained Plaintiff's employment records prior to arrest and that the information had been obtained orally. Pl. Facts ¶¶ 79–81; Schwartz Cert. Ex. 7 at 3.

Plaintiff also disputes the veracity of statements made by Sgt. Crocco regarding the circumstances surrounding law enforcement's arrival at his residence.  First, Plaintiff argues that the record does not necessarily support Sgt. Crocco's statement that the lights to his apartment were turned off upon law enforcement knocking on the door.  Plaintiff points to a transcript of a call between law enforcement officers that night which states that the lights were shut off as law enforcement was "approaching."  Pl. Facts ¶ 88; Schwartz Cert. Ex. 26 at 2:9–13.  Second, Plaintiff

9

notes that Sgt. Crocco did not inform Judge Jorgensen that law enforcement knocked on an exterior door, not the door leading directly to Plaintiff's apartment.  Pl. Facts ¶ 86; Schwartz Cert. Ex. 4 at 180:11–184:20. Third, as noted above, Plaintiff maintains that he did not attempt to escape through the back window of his apartment.  Pl. Facts ¶ 89.  Fourth, Plaintiff disputes whether law enforcement could have possibly heard a "phone ringing inside the apartment" while outside.  Pl. Facts ¶ 95.  Finally, Plaintiff disputes the veracity of the statements of Assistant Prosecutor LaMountain that Plaintiff had been previously charged with a drug offense and that he was a "prime suspect in the homicide."  Pl. Facts ¶¶ 106–07.

### iii.    Law Enforcement Arrest Saintil and Search His Residence

The developments at Plaintiff's residence were relayed to Lt. Mastropolo of the Hamilton Police by both Det. O'Connor and Sgt. Crocco.  Specifically, Lt. Mastropolo learned that Plaintiff was "a suspect in a homicide investigation," that Plaintiff was inside his apartment and had refused to answer his door, and that Plaintiff may have attempted to exit through the back window.  ECF No. 124-2, Hamilton Defendants' Statement of Material Facts ("Hamilton Facts") ¶¶ 13–14; Certification of Charles F. Holmgren ("Holmgren Cert.") Ex. C at 43:18–25, 65:20–23, 66:3–5. Lt. Mastropolo conveyed this information to Hamilton Police Chief James Collins and Captain James Stevens.  Hamilton Facts ¶¶ 17–19.  Once the Hamilton Police learned that Sgt. Crocco had obtained a telephonic search warrant, the operation was turned over to Captain Stevens, who commanded the Hamilton SWAT Team.  Hamilton Facts ¶ 18; Pl. Facts ¶ 139.  In addition to the information given to the Hamilton Police by Det. O'Connor and Sgt. Crocco, a background check performed by the Hamilton Police revealed a recent, prior arrest of Plaintiff in connection with a domestic violence incident.  Hamilton Facts ¶ 22.  At the time of the breach of Plaintiff's apartment

in execution of the search warrant and arrest, Captain Stevens and the Hamilton SWAT Team did not have any specific knowledge as to whether Plaintiff was armed.  Hamilton Facts ¶ 23.

Approximately one minute before breaching Plaintiff's apartment, Officer DeMeo of the Hamilton Police called Plaintiff's cellphone, again, in a call lasting four seconds.  Pl. Facts ¶ 168. At 9:30 p.m., the Hamilton SWAT Team made a "hold the air" request through the Hamilton Police dispatch system in order to pause all radio traffic prior to entering Plaintiff's residence. Hamilton Facts ¶ 28; Carteret Facts ¶ 41.  At Captain Stevens' command, the Hamilton SWAT Team forcibly entered Plaintiff's apartment, with Officer Murphy using a 60-pound battering ram to breach the front door of the premises.  Carteret Facts ¶ 37; MCPO Facts ¶ 31; Pl. Facts ¶ 174. The twelve SWAT Team members who gained entry to the residence wore tactical body armor and carried a variety of high-powered assault weapons.  Pl. Facts ¶ 166, 178–79.  The SWAT Team pointed their weapons at Plaintiff until he was placed in handcuffs.  Hamilton Facts ¶ 41; MCPO Facts ¶ 34.  Within 15 to 30 seconds of the breach, the apartment was deemed secure.  Hamilton Facts ¶ 29.  Plaintiff was taken into custody at 9:31 p.m.  Hamilton Facts ¶ 29.  Once Plaintiff was handcuffed, Sgt. Crocco entered the residence, identified himself, told Plaintiff that officers had come to his apartment to question him regarding a murder investigation, and explained that a warrant had been executed following his refusal to make contact with law enforcement.  MCPO Facts ¶ 35.  At approximately 9:41 p.m., Plaintiff was transported to the Hamilton Police Department in a patrol car by Officers Woodhead and Shuster.  Carteret Facts ¶ 41; Pl. Facts ¶ 184.

At 10:13 p.m., Det. Zebib and Det. O'Connor took a formal statement from Plaintiff at the Hamilton Police Department.  Carteret Facts ¶ 45, Ex. A.  The detectives explained to Plaintiff that he was under arrest for hindering an investigation and read Plaintiff his Miranda rights.  Schwartz

Cert. Ex. 11.  Plaintiff told the detectives he had been in Newtown, Pennsylvania for work earlier that day and the day before.  *Id.*  Plaintiff also stated that he had been on the phone with his lawyer when the police waited outside his residence.  *Id.*  After brief questioning as to the timing of when Plaintiff arrived home from work the night prior, Plaintiff invoked his right to an attorney, ending the interview.  *Id.*

After taking Plaintiff's statement, Det. O'Connor prepared an Affidavit of Probable Cause and Complaint Warrant 1103-W-2015-000240, charging Plaintiff with hindering his own apprehension.  Carteret Facts ¶ 50.  The Affidavit of Probable Cause states: "The facts and circumstances which I believe establish probable cause are that the suspect was seen in his apartment by officers and the suspect then retreated into his residence and refused to answer his door to his residence or answer his phone. Both were tried numerous times."  Carteret Facts ¶ 52; Schwartz Cert. Ex. 18.  The Complaint Warrant states Plaintiff was "hiding in his apartment after being seen by officers in the window of his residence and refusing to come to the door after numerous attempts to contact the party."  Carteret Facts ¶ 51; Schwartz Cert. Ex. 17.  In deposition testimony, Det. O'Connor stated that at the time the charging documents were prepared he understood that "there could have been potential evidence in the home that [Plaintiff] was trying to conceal . . . and that evidence could have been destroyed in the house itself."  Carteret Facts ¶ 55; Schwartz Cert. Ex. 4 at 252:12–17.

At approximately 10:25 p.m., Det. James Napp arrived at Plaintiff's apartment and proceeded to photograph the scene and seize Plaintiff's driver's license, cellphone, computer tower, and his 1999 Jeep Grand Cherokee.  Carteret Facts ¶ 48.  At 12:15 a.m., on January 31, 2015, Det. Napp cleared the scene at Plaintiff's residence.  *Id.*  From 1:25 a.m. until 2:15 a.m.,

Plaintiff's vehicle was searched.  *Id.*  A duplicate original search warrant[5] notes the items to be searched and seized, including "weapons" and "clothing, blood, biological fluids, DNA, computers, paperwork, and any other item of evidentiary value in the murder investigation of Tony Mocci."  ECF No. 158-2, Declaration of Andreea Zebib ("Zebib Decl.") Ex. A.  Ultimately, the search of Plaintiff's residence and vehicle did not reveal any evidence of criminality.  Carteret Facts ¶ 56; Pl. Facts ¶¶ 47–52.

### C.  Saintil's Detention and the Dismissal of the Charge Against Him

Following his statement to the detectives late at night on January 30, 2015, Plaintiff was placed in a holding cell at the Hamilton Police Department on $100,000 bail.  Pl. Facts ¶ 189; Schwartz Cert. Ex. 40.  Plaintiff was transferred to the Mercer County Jail on February 2, 2015. *Id.*  Plaintiff was released from jail on February 9, 2015, on his own recognizance, 10 days after his arrest.  Pl. Facts ¶ 118; Schwartz Cert. Ex. 29.

During this time, law enforcement continued the homicide investigation.  On February 1, 2015, MCPO and Carteret detectives were advised that Adison Trigueno had forged a check, dated January 29, 2015, from Mocci's business checking account in the amount of $4,300.  Carteret Facts ¶ 59; Pl. Facts ¶¶ 5–6.  Law enforcement confirmed that Trigueno had deposited the fraudulent check, and, on February 3, 2015, he was charged with forgery, uttering, and theft by unlawful purpose.  Carteret Facts ¶ 62.  On February 5, 2015, Det. Zebib applied for Communications Data Warrants ("CDW") for Plaintiff's and Adison Trigeuno's phone numbers.  Carteret Facts ¶ 64, Ex. A.  On February 9, 2015, the day that Plaintiff was released from jail, the

---

[5] The MCPO Defendants attached the duplicate original search warrant as Exhibit A to the unsigned Declaration of Det. Andreea Zebib, submitted in support of their Reply brief.  *See* ECF No. 158-2.  In his surreply, Plaintiff challenges the authenticity and validity of the duplicate original.  ECF No. 162.

MCPO received the results of the CDWs, which indicated that Plaintiff had not recently communicated with Anthony Mocci and was not located in the relevant area at the time of the murder.  Carteret Facts ¶ 67; MCPO Facts ¶ 40.  On February 18, 2015, Trigueno was charged with the murder of Anthony Mocci.  Pl. Facts ¶ 10.

Without citation to record evidence, the Carteret and MCPO Defendants maintain that the decision to dismiss charges against Plaintiff was made on February 9, 2015, after receiving the CDW results.  Carteret Facts ¶ 68; MCPO Facts ¶ 40.  Although Plaintiff was released on his own recognizance on February 9, 2015, the charges against Saintil for hindering his own apprehension were not officially dismissed until November 2, 2015, when Det. O'Connor failed to appear for the scheduled court hearing.  Pl. Facts ¶¶ 120–21; Schwartz Cert. Ex. 30, 45.

Plaintiff testified that he experienced severe stress and anxiety as a result of the forcible entry into his home.[6]  Pl. Facts ¶ 192.  Following his release from jail, he attended one therapy session with Dr. Cledicianne Dorvil, Ph.D., in Trenton, New Jersey to address these issues.  Pl. Facts ¶ 192.  Additionally, Plaintiff's primary care physician diagnosed him with anxiety and prescribed him Xanax.  Schwartz Cert. Ex. 46.  At the time of his arrest, Saintil was employed as a painter by Makortiz & Sons Inc.  He was terminated from his employment for failure to report to work because of his detention.  Pl. Facts ¶ 193.  On February 10, 2015, Plaintiff received a letter from his landlord stating that as a result of the "search and seizure" of the apartment any "offer to renew your lease is hereby revoked" and instructing Plaintiff "to make arrangements for an immediate move-out."  Schwartz Cert. Ex. 44.

---

[6] Plaintiff has not produced any expert reports as to any physical injuries or as to any mental or emotional harm suffered as a result of the incident.

### D.  Procedural History

On July 28, 2018, Plaintiff filed the Second Amended Complaint.  ECF No. 59 ("SAC"). The SAC asserts the following federal and state law claims against Defendants: unlawful search and seizure in violation of 42 U.S.C § 1983 and the Fourth Amendment (Count 1), and in violation of the New Jersey State Constitution, the New Jersey Civil Rights Act ("NJCRA"), and the New Jersey Tort Claims Act ("NJTCA") (Count 8); use of excessive force in violation of 42 U.S.C. § 1983 and the Fourth Amendment (Count 2), and in violation of the New Jersey State Constitution, the NJCRA, and the NJTCA (Count 9); false arrest and false imprisonment in violation of 42 U.S.C. § 1983 and the Fourth Amendment (Count 3), and in violation of the New Jersey State Constitution, the NJCRA, and the NJTCA (Count 10); malicious prosecution in violation of 42 U.S.C. § 1983 and the Fourth Amendment (Count 4), and in violation of the New Jersey State Constitution, the NJCRA, and the NJTCA (Count 11); conspiracy to violate civil rights contrary to 42 U.S.C. § 1983 and the Fourth Amendment (Count 5), and in violation of the New Jersey State Constitution, the NJCRA, and the NJTCA (Count 12); supervisory liability  under 42 U.S.C. § 1983 for failure to train (Count 6), and in violation of the New Jersey State Constitution, the NJCRA, and the NJTCA (Count 13); municipal liability under 42 U.S.C. § 1983 (Count 7), and in violation of the New Jersey State Constitution, the NJCRA, and the NJTCA (Count 14); negligence (Count 15); intentional infliction of emotional distress (Count 16); punitive damages (Count 17); vicarious liability (Count 18); joint and several liability (Count 19); and attorneys' fees and costs under 42 U.S.C. § 1988 and the NJCRA (Count 20).

On February 10, 2022, following a period of discovery, the Carteret Defendants, including Defendants O'Connor and Wargocki, filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56.  ECF No. 116, 118, 121, ("Carteret Mot.").  That same day, the MCPO Defendants also

filed for summary judgment.  ECF No. 122, ("MCPO Mot.").  On February 14, 2022, the Hamilton

Defendants filed a motion for summary judgment, as well. ECF No. 124, ("Hamilton Mot.").  On

June 3, 2022, Plaintiff opposed Defendants' three dispositive motions.  ECF No. 143, ("Pl.

Opp'n").  Subsequently, on June 7, 2022, Plaintiff advised the Court that he does not oppose

summary judgment as to Defendants Piecsyski, Mastropolo, Wargocki, Morris, and Collins.

Additionally, Plaintiff stated that he did not oppose summary judgment as to Counts 5, 6, 7, 12,

13, 14, 15, and 16.  ECF No. 144.

On July 11, 2022, the Carteret Defendants, Defendant O'Connor, separately, and the

Hamilton Defendants filed replies.  ECF No. 152, 153, 155.  The MCPO Defendants filed their

reply on July 15, 2022. ECF No. 158.

The claims enumerated in Plaintiff's June 7, 2022 letter to the Court, along with Defendants

named therein, are deemed dismissed.  Specifically, the Court dismisses Plaintiff's claims as to

conspiracy (Counts 5 & 12), supervisory liability (Counts 5 & 13), municipal liability (Counts 7

& 14), negligence (Count 15), and intentional infliction of emotional distress (Count 16) as to all,

as well as all claims against Defendants Piecsyski, Mastropolo, Wargocki, Morris, and Collins.

The issues remaining for adjudication on these motions for summary judgment are set forth and

discussed in detail *infra*.

## II.   **STANDARD OF REVIEW**

Summary judgment is appropriate where "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute

is "genuine" when "a reasonable jury could return a verdict for the non-moving party." *Anderson

v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986).  And a fact is "material" only if it has the ability

to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418,

423 (3d Cir. 2006) (citation omitted.) Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248.

The moving party bears the burden of showing that no "genuine issue" exists such that summary judgment is warranted. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Once the movant adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324.

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004). Rather, "[a]ll facts and inferences are construed in the light most favorable to the non-moving party." *Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). The court's role is "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. There can be "no genuine issue as to any material fact," however, if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322–23.

## III.   <u>DISCUSSION</u>

Plaintiff's remaining claims hinge on four main theories of liability under federal and state law: (1) false arrest and false imprisonment (Counts 3 & 10); (2) unlawful search and seizure (Counts 1 & 8); (3) malicious prosecution (Counts 4 & 11); and (4) excessive force (Counts 2 & 9). In their motions for summary judgment, the Carteret, MCPO, and Hamilton Defendants all

contend that Plaintiff fails to state a claim with regard to their respective conduct.  In addition, each of the three groups of Defendants raise the defense of qualified immunity.

"To recover under 42 U.S.C. § 1983, [a plaintiff] must establish that a state actor engaged in conduct that deprived him of 'rights, privileges, or immunities' secured by the constitution or laws of the United States." *Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000) (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996)).  Modeled after 42 U.S.C. § 1983, the NJCRA "creates a private cause of action for violations of civil rights secured under the New Jersey Constitutions." *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443 (D.N.J. 2011).  Courts in this district have consistently construed the NJCRA in terms nearly identical to § 1983.  *See Samoles v. Lacey Twp.*, No. 12-3066, 2014 WL 2602251, at *15 (D.N.J. June 11, 2014) ("courts in New Jersey have consistently looked at claims under the NJCRA through the lens of § 1983"); *Chapman v. New Jersey*, No. 08-4130, 2009 WL 2634888, at *3 (D.N.J. Aug. 25, 2009).

Where state actors invoke the qualified immunity defense, courts engage in a two-step analysis.  *See Williams v. Secretary Pennsylvania Dep't of Corrections*, 848 F.3d 549, 557 (3d Cir. 2017).  First, the court must "determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all." *Wilson*, 212 F.3d at 786 (quoting *Conn v. Gabbert*, 526 U.S. 286, 290 (1999)).  If so, then the court will "proceed to determine whether that right was clearly established at the time of the alleged violation." *Id.*  "Summary judgment is appropriate if no reasonable juror could conclude that [the plaintiff's] clearly established rights were violated." *Id.* (citing *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995)).

### A.  The False Arrest and False Imprisonment Claims (Counts 3 & 10)

To state a claim for false arrest under § 1983, a plaintiff must allege that he was arrested by a state actor without probable cause.  *See Palma v. Atlantic County*, 53 F. Supp. 2d 743, 755

(D.N.J. 1999) (citing *Sharrar v. Felsing*, 128 F.3d 810, 817–18 (3d Cir. 1997)).   "[W]here the police lack probable cause to make an arrest, the arrestee [also] has a claim under § 1983 for false imprisonment based on a detention pursuant to that arrest."   *Groman v. Township of Manalapan*, 47 F.3d 628, 636 (3d Cir. 1995).   Conversely, "an arrest based on probable cause [can] not become the source of a claim for false imprisonment [or unlawful arrest]."   *Palma*, 53 F. Supp. 2d at 755 (quoting *Groman*, 47 F.3d at 636).

"[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested."   *Estate of Smith v. Marasco*, 318 F.3d 497, 514 (3d Cir. 2003) (quoting *Orsatti*, 71 F.3d at 482)).   Typically, "the question of probable cause in a section 1983 damage suit is one for the jury."   *Montgomery v. De Simone*, 159 F.3d 120, 124 (3d Cir. 1998).   However, "a district court may conclude 'that probable cause did exist as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding,' and may enter summary judgment accordingly."   *Estate of Smith*, 318 F.3d at 514 (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997)).

Here, Plaintiff alleges he was arrested without probable cause on the charge of hindering his own apprehension under N.J.S.A. 2C:29-3b(1).   SAC ¶¶ 78–82, 114–115; Pl. Opp'n 15–33. Plaintiff acknowledges, for summary judgment purposes, that he was arrested pursuant to a warrant, but contends that the warrant was not supported by probable cause.   Pl. Opp'n 17.   In particular, Plaintiff argues that Det. O'Connor and Sgt. Crocco recklessly disregarded the truth in the context of the telephonic warrant application, and that a truthful warrant application would have been found to lack probable cause.   Pl. Opp'n 18–21.   Additionally, Plaintiff asserts that no reasonable officer would have concluded that the warrant should issue.   Pl. Opp'n 21–22.

"[A] plaintiff may succeed in a § 1983 action for false arrest made pursuant to a warrant if the plaintiff shows, by a preponderance of the evidence: (1) that the police officer 'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant;' and (2) that 'such statements or omissions are material, or necessary, to the finding of probable cause.'" *Wilson*, 212 F.3d at 786–87 (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)).  As such, "an arrest warrant issued by a magistrate or judge does not, in itself, shelter an officer from liability for false arrest." *Id.*

Courts must first consider "whether [the plaintiff] adduced sufficient evidence that a reasonable jury could conclude that [the defendant(s)] made statements or omissions that he 'knew [were] false, or would have known [were] false except for his reckless disregard for the truth.'" *Wilson*, 212 F.3d at 787 (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984).  For purposes of assessing whether assertions and omissions were made with a reckless disregard for the truth, the Third Circuit has articulated separate standards.

With respect to omissions, courts must recognize that "[a]ll storytelling involves an element of selectivity" and thus "cannot demand that police officers relate the entire history of events leading up to a warrant application with every potentially evocative detail that would interest a novelist or gossip." *Id.*  Still, "a police officer cannot make unilateral decisions about the materiality of information, or, after satisfying him or herself that probable cause exists, merely inform the magistrate or judge of inculpatory evidence." *Id.*  Balancing these considerations, omissions are made with reckless disregard "if an officer withholds a fact that '[a]ny reasonable person would have known . . . was the kind of thing the judge would wish to know.'" *Id.* (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)).

Here, Plaintiff argues that Sgt. Crocco failed to disclose to Judge Jorgensen that the door officers knocked upon was an exterior door leading to a common hallway, which ultimately led to Plaintiff's entryway door.  Pl. Opp'n 19.  The record is unclear, however, on which door the officers were knocking.[7]  In any event, the Court cannot engage in factfinding with respect to whether this purported omission was made with reckless disregard for the truth as such credibility determinations fall within the province of the jury.  As set forth in further detail *infra*, assuming the omission was made with reckless disregard, the Court finds that it is immaterial to the probable cause determination, particularly considering that the officers had identified themselves, knocked various times, and called Plaintiff on his cellphone.  Importantly, the record indicates that Plaintiff, based on these various attempts, which he has not disputed, was aware of law enforcement's presence.  Schwartz Cert. Ex. 11 at 12:4–7 ("I heard a noise in the back and then, you know, I lifted ah the blind and then, you know, looked to see what was going on.  And then I went back to the front, that's when I saw-I saw the police cars.").

With respect to assertions, "recklessness is measured not by the relevance of the information, but the demonstration of willingness to affirmatively distort truth."  *Wilson*, 212 F.3d at 788.  "An assertion is made with reckless disregard when 'viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'"  *Id.* (quoting *United States v. Clapp*, 46 F.3d 795, 801 n.6 (8th Cir. 1995).

In this case, Plaintiff lists a series of purportedly false assertions made in relation to the warrant application by Det. O'Connor and Sgt. Crocco, including: Plaintiff was observed

---

[7] The Court notes that the record indicates that officers only required the use of a battering ram upon a single door, which provided access to Plaintiff's apartment.  Thus, it is not clear what role the purported exterior door played in the encounter.

attempting to exit his apartment through the back window; Plaintiff had an "ongoing" dispute with Mocci; Plaintiff had been "fired" by Mocci; Plaintiff and Mocci had made death threats toward each other; police had obtained employment records from Lisa Mocci confirming Plaintiff's employment with Mocci; Plaintiff's car matched the car described by Jacklyn Cruz; Plaintiff turned off the lights in his apartment when officers knocked on the door to the residence; officers could hear Plaintiff's cellphone ringing; and Plaintiff had a prior drug charge. Pl. Opp'n 18–20. To determine whether either Det. O'Connor or Sgt. Crocco made such representations with reckless disregard for the truth would require the Court to engage in inappropriate factfinding. For example, with respect to Plaintiff's potential escape effort, a fact that Plaintiff vehemently disputes, the Court notes that Det. O'Connor reported such an attempt at the time, and maintained that same belief in his deposition testimony. Pl. Opp'n 20; Pl. Facts ¶ 94. The detective's version contradicts that of Plaintiff's. However, the Court cannot determine at the summary judgment stage whose version of events to credit. Additionally, with respect to Plaintiff's relationship with Mocci, certain statements made by Sgt. Crocco do not appear wholly supported by the witness interviews conducted by law enforcement earlier that day. Still, whether such statements were made with a reckless disregard for the truth is a different question, especially as Plaintiff does not dispute that he had recently been in a disagreement with Mocci with regard to Plaintiff's backpay. Schwartz Cert. Ex. 8 at 89:2–92:5. All other remaining alleged misrepresentations similarly present disputed facts. In short, on a summary judgment motion, the Court cannot assess whether the purported misrepresentations were reckless or intentional without engaging in inappropriate

factfinding.  Importantly, however, even assuming that the disputed inaccuracies raised by Plaintiff were made with reckless disregard,[8] they are not material.

"To determine the materiality of the misstatements and omissions, [courts] excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause." *Wilson*, 212 F.3d at 789 (citing *Sherwood*, 113 F.3d at 399).  Here, the "corrected" warrant application would consist of the following undisputed facts: (1) law enforcement was investigating the murder of Anthony Mocci, found dead at a residence in Carteret, New Jersey on the morning of January 30, 2015; (2) detectives took a sworn statement from Adison Trigueno, an employee of Mocci who discovered his body; (3) Trigueno identified an individual named Ronald who was a former employee of Mocci; (4) Trigueno stated that Ronald and Mocci had a monetary dispute and that Mocci had spoken violently about him; (5) Trigueno stated that Ronald was Haitian and drove a black Jeep; (6) law enforcement ascertained that "Ronald" was Ronald Saintil; (7) according to DMV records, Saintil owned a back 1999 Jeep Grand Cherokee; (8) detectives interviewed Mocci's neighbor who stated that she had seen a black Jeep the night before briefly parked outside the residence where Mocci's body was found; (9) law enforcement traveled to Saintil's residence to conduct an interview; (10) at some point shortly after law enforcement arrived the lights in Saintil's residence were turned off; (11) a 1999 black Jeep Grand Cherokee registered to Ronald Saintil was parked

---

[8] The MCPO Defendants maintain that Sgt. Crocco's statements to Judge Jorgensen were not made with reckless disregard and that there is indeed support in the record for the statements that Plaintiff disputes. ECF No. 158 at 5–10.  For instance, Plaintiff asserts that Sgt. Crocco falsely claimed that Lisa Mocci, the wife of the deceased, identified Plaintiff as an employee of Mocci.  ECF No. 143 at 19.  But, in her deposition, Det. Zebib, who questioned Mrs. Mocci on January 30, 2015, stated that Mrs. Mocci had assisted officers in identifying persons who Trigueno had mentioned, including providing the last name for the person Trigueno identified as "Ronald."  *See* ECF No. 158-1, Supplemental Declaration of Robert J. McGuire ("Supplemental McGuire Decl.") Ex. B. at 74:1–76:25.

outside the residence; (12) police knocked on the exterior door of the residence and identified themselves but received no response; (13) Det. O'Connor observed an individual fitting Trigueno's description of Saintil at the back window of the residence who then retreated out of sight; (14) law enforcement made numerous additional, unsuccessful attempts over the course of nearly two hours to make contact with Saintil, including by knocking on the door of the residence and calling his cellphone.  Because these basic facts support a finding of probable cause, *see infra*, for Plaintiff's arrest on the hindering charge, the alleged misrepresentations Plaintiff identifies as having been made by both Det. O'Connor and Sgt. Crocco were not material.

"[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *United States v. Jones,* 994 F.2d 1051, 1056 (3d Cir.1993) (internal quotation marks and citation omitted).  The standard "depends on the totality of the circumstances."  *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).  "Probable cause exists if there is a 'fair probability' that the person committed the crime at issue."  *Wilson*, 212 F.3d at 789 (quoting *Sherwood*, 113 F.3d at 401).

Plaintiff was charged with violating N.J.S.A 2C:29-3b(1).  *See* Schwartz Cert. Ex. 17, 18. Under that statute,

> A person commits an offense if, with purpose to hinder his own detention, apprehension, investigation, prosecution, conviction or punishment for an offense . . . he:
>
> (1) Suppresses, by way of concealment or destruction, any evidence of the crime or tampers with a document or other source of information, regardless of its admissibility in evidence, which might aid in his discovery or apprehension or in the lodging of a charge against him.

N.J.S.A. 2C:29-3b(1).  At the time of the warrant application, Plaintiff had become a suspect in a homicide investigation, turned off all the lights in his apartment after law enforcement arrived, was identified as present in his apartment, and was refusing to interact with law enforcement, either

through in-person contact or over the phone.   These circumstances give rise to the "fair probability," from a reasonable officer's on-the-scene perspective, that Plaintiff was engaged in the act of hindering law enforcement's investigation.   In his Affidavit of Probable Cause, Det. O'Connor wrote: "the suspect was seen in his apartment by officers. The suspect then retreated into his residence and refused to answer his door to his residence or answer his phone. Both were tried numerous times."  Schwartz Cert. Ex. 18.   In deposition testimony, when asked whether he knew what sort of evidence Plaintiff may have concealed, Det. O'Connor stated: "At that time we didn't know which evidence that he did conceal. We knew that we were trying to make contact and there could be potential evidence in the home that he was trying to conceal based on the circumstances, and that evidence could have been destroyed in the house itself."  Carteret Facts, Ex. B at 252:12-17.  From law enforcement's perspective, upon arrival at Plaintiff's residence, Plaintiff was merely a person of interest who they sought to interview about a homicide.   But Plaintiff's intentional and prolonged avoidance of law enforcement, including shutting off his apartment lights, refusing to answer his door or cellphone, and retreating into the interior of his apartment after seeing Det. O'Connor at his back window, raised serious suspicion and the reasonable inference that Plaintiff might be attempting to conceal evidence of a crime relevant to the investigation.  This is especially true given that: the officers were aware of the fact that Plaintiff had worked for Mocci, Mocci had refused to pay him, and Plaintiff owned a black Jeep Grand Cherokee, which fit the description of a suspicious car in the area the night before the murder.

Plaintiff repeatedly emphasizes that Det. O'Connor's Affidavit of Probable Cause did not mention that Plaintiff had allegedly tried to exit through the back window of his apartment, thus indicating O'Connor's untruthfulness about the situation.  Pl. Opp'n 23.  But the omission of this allegation was not material to Judge Jorgensen's finding of probable cause.  Approving the

hindering charge, Judge Jorgensen found that probable cause existed based on the totality of the circumstances presented to him—namely the "ongoing . . . homicide investigation" and the fact that Plaintiff had become "the prime suspect."[9]  Schwartz Cert. Ex. 16.  Thus, even without the purported attempt to flee, Plaintiff's actions to avoid law enforcement under the circumstances were sufficient to charge Plaintiff with hindering.  *See Fraenkel v. Garcia*, No. 18-9281, 2019 WL 2619130, at *10 (D.N.J. June 26, 2019) (finding probable cause for hindering charge N.J.S.A. 2C:29-3 "even if the evidence did not ultimately support [suspect's] conviction"); *Morris v. United States*, No. 12-2926, 2015 WL 4171355, at *6 (D.N.J. July 9, 2015) (finding probable cause for hindering charge under N.J.S.A. 2C:29-3 based on the resident's "failure to open the door to his home when commanded by the police officers in an effort to prevent the arrest" of another).

Additionally, Plaintiff's actions cannot be viewed with the benefit of hindsight.  Nor were officers required to know with any degree of certainty that Plaintiff had relevant evidence in his possession.  Pl. Opp'n 24; Pl. Facts ¶¶ 47–51.  Whether probable cause exists for an arrest must be assessed through "the facts and circumstances within the arresting officer's knowledge."  *Wilson*, 212 F.3d at 789.  And because "probable cause requires only a probability or substantial

---

[9] Plaintiff repeatedly points out that the $100,000 bail approved by Judge Jorgensen constituted a significant deviation from the New Jersey Bail Schedule.  Pl. Opp'n 45 n.15; Schwartz Cert. Ex. 31.  However, Plaintiff does not set forth a claim for excessive bail in the Second Amended Complaint, and Plaintiff cannot amend his complaint through briefing.  *See Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.") (internal quotation marks omitted).  In any event, with respect to bail, "[e]xcessiveness cannot be determined by a general mathematical formula, but rather turns on the correlation between the state interests a judicial officer seeks to protect and the nature and magnitude of the bail conditions imposed in a particular case."  *Keeler v. City of Hammonton*, No. 11-02745, 2013 WL 6499257, at *6 (D.N.J. Dec. 11, 2013).  Without any express argument as to the correlation between the state interests and the bail, Plaintiff has failed to raise a genuine issue of material fact as to the propriety of the terms of his detention.

chance of criminal activity . . . innocent behavior frequently will provide the basis for a showing of probable cause." *Illinois v. Gates*, 462 U.S. 213, 245 n.13 (1983). "[T]he relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of non-criminal acts." *Id.* Further, under New Jersey law, the charge of hindering apprehension "does not require that [the] defendant actually be charged with . . . the underlying offense" that is the subject of the investigation or prosecution. *See State v. Young*, 152 A.3d 955, 964 (N.J. App. Div. 2017). Because Plaintiff was a person of interest in the murder investigation of Anthony Mocci, his suspicious activity and prolonged avoidance of law enforcement, which lasted approximately two hours, raised the reasonable inference in the minds of both Det. O'Connor and Sgt. Crocco that Plaintiff was attempting to hide something relevant to officers' investigation.[10]

Because Plaintiff has failed to raise a genuine issue of material fact with respect to whether probable cause existed for his arrest, the Court finds that summary judgment is appropriate as to Defendants Det. O'Connor and Sgt. Crocco, along with all other Defendants named in the Second Amended Complaint, with respect to Plaintiff's § 1983 and NJCRA claims for false arrest and false imprisonment.

**B.  The Unlawful Search and Seizure Claims (Counts 1 & 8)**

Plaintiff's claims for unlawful search and seizure of his property are governed by a similar standard as those for false arrest and imprisonment. "A section 1983 plaintiff who challenges the validity of a search warrant by asserting that law enforcement agents submitted a false affidavit to the issuing judicial officer must satisfy the two-part test developed by the Supreme Court" in

---

[10] Because there was probable cause for Plaintiff's arrest based on the undisputed circumstances, Plaintiff's additional argument that Det. O'Connor and Sgt. Crocco should not have applied for a warrant in the first place need not be addressed.  Pl. Opp'n 30–33

*Franks v. Delaware*, 438 U.S. 154 (1978).  *Sherwood*, 113 F.3d at 399.  "Under *Franks,* falsehoods are deemed material to the finding of probable cause if the affidavit, 'with the . . . false material set to one side . . . is insufficient to establish probable cause.'"  *Id.* (quoting *Franks*, 438 U.S. at 156).

### i.   The Search Warrant Was Supported by Probable Cause

As set forth *supra*, the telephonic warrant application was supported by probable cause to charge Plaintiff with hindering apprehension.  Probable cause for the issuance of a search warrant requires a "fair probability that contraband or evidence of a crime will be found in a particular place."  *Jones*, 994 F.2d at 1056.   While probable cause to arrest "hinges on the distinct and discrete inquiry into whether the person to be arrested has committed or is committing a criminal offense," the inquiry with respect to a search warrant "must assess the connection of the item sought to be seized 1) to the crime being investigated, and 2) to the location to be searched as its likely present location."  *State v. Chippero*, 987 A.2d 555, 564 (N.J. 2009).  As such, "the factual predicate for a showing of probable cause to arrest may not be necessarily the same as that required for probable cause to search."  *Id.* (collecting cases).  However, in the present context, the two are intimately intertwined.  Plaintiff was arrested for the specific offense of concealing evidence that might aid in the lodging of a charge against him in the Mocci homicide investigation.  That probable cause determination inherently involved consideration as to whether there was a "fair probability" that evidence of a crime was located in Plaintiff's residence or vehicle.  Thus, because probable cause existed with respect to the hindering charge, probable cause also existed for the issuance of the search warrant.

ii.     *The Search Warrant Was Properly Issued Under* **N.J. Ct. R. 3:5-3(c)**
       *and Consistent with the Fourth Amendment*

Plaintiff raises the additional argument that the search warrant was invalid on its face because "[t]he telephonic warrant application is silent as to any identification or description of the items to be seized." Pl. Opp'n 37. But Judge Jorgensen's approval of the search warrant properly authorized law enforcement to search Plaintiff's residence and vehicle for items relevant to the homicide investigation. Moreover, the scope of this authorization is consistent with the contents of the duplicate original search warrant issued pursuant to N.J. Ct. R. 3:5-3(c), *see* Zebib Decl. Ex. A., and the items seized by law enforcement during the search. *See* Schwartz Cert. Ex. 41.

"The Fourth Amendment by its terms requires particularity in the warrant." *Groh v. Ramirez*, 540 U.S. 551, 557 (2004). In *Groh*, the Supreme Court held that where a "warrant did not describe the items to be seized *at all* . . . the warrant was so obviously deficient" that it violated the "particularity requirement of the Fourth Amendment" giving rise to *Bivens* and § 1983 claims. 540 U.S. at 558. Relying on this language, Plaintiff highlights that the telephonic warrant application does not expressly list the items to be seized and argues that the search was therefore "warrantless." Pl. Opp'n 36. However, Judge Jorgensen, having heard testimony from Sgt. Crocco that Plaintiff was a suspect in a homicide investigation, approved "the issuance of the search warrant to search the premises of 58 Graddy Avenue, Apartment A in Hamilton, New Jersey as well as the 1999 black Jeep Grand Cherokee." Schwartz Cert. Ex. 16 at 6:17–19. In connection with this authorization, Judge Jorgensen expressly noted the "ongoing . . . homicide investigation" and the fact that Plaintiff was a suspect, thus limiting the search to items relevant to the investigation. *Id.* at 7:2–3; *see United States v. Yusuf*, 461 F.3d 374, (3d Cir. 2006) (recognizing that "the breadth of items to be searched depends upon the particular factual context of each case and also the information available to the investigating agent that could limit the search at the time

the warrant application is given to the magistrate").  In this case, the search, pursuant to a warrant, which was limited to specified areas and evidence relevant to an evolving homicide investigation, does not amount to a "warrantless" search.  *Cf. Groh*, 540 U.S. at 558 ("in the space set aside for a description of the items to be seized, the warrant stated that the items consisted of a 'single dwelling residence ... blue in color'"); *In re 650 Fifth Avenue and Related Properties*, 830 F.3d 66, 99 (2d Cir. 2016) (stating that "for a warrant to meet the particularity requirement, it must identify the alleged crime for which evidence is sought").

While Judge Jorgensen's verbal authorization alone sufficiently communicated the scope of the search to law enforcement, his authorization is also consistent with the duplicate original warrant ultimately issued pursuant to N.J. Ct. R. 3:5-3(c), which delineates the procedure for telephonic warrant applications.[11]  For summary judgement purposes, the Court need not consider, and will not reply upon, the duplicate original search warrant introduced by the MCPO Defendants for the first time in connection with their reply brief.[12]  *See* Zebib Decl. Ex. A.  Indeed, Plaintiff does not argue that the search exceeded the scope approved by Judge Jorgensen—that is, that law enforcement seized items irrelevant to the homicide investigation.  The items seized by law

---

[11] N.J. Ct. R. 3:5-3(c) sets forth a specific procedure for obtaining a telephonic warrant by which the "sworn oral testimony" of the warrant applicant is recorded and "shall be deemed to be an affidavit for the purposes of issuance of a search warrant."  N.J. Ct. R. 3:5-3(c).  "A warrant may issue if the judge is satisfied that sufficient grounds for granting the application have been shown."  *Id.*  Upon approval, the judge directs the warrant applicant to enter the terms of the authorized search on a form "designated the duplicate original warrant."  *Id.*  The duplicate original warrant "shall be deemed a search warrant."  *Id.*

[12] Plaintiff submitted a surreply urging the Court to disregard the duplicate original search warrant.  ECF No. 162. Therein, Plaintiff also suggests that because the duplicate original was not officially signed by Judge Jorgensen until February 20, 2015, "Crocco backfilled the description of the items to be searched for and seized."  *Id.*  Because the Court finds Judge Jorgensen's verbal authorization of the search sufficient, it need not resolve this issue to decide the summary judgment motions.

enforcement included Plaintiff's driver's license, cellphone, and computer.  *See* Schwartz Cert. Ex. 41.

Accordingly, Plaintiff has failed to raise a genuine issue of material fact as to the validity of the telephonic search warrant.  Because the search warrant was supported by probable cause and because the scope of the search warrant approved by Judge Jorgensen described the areas to be search and potential evidence to be seized, consistent with the homicide investigation, Defendants are entitled to summary judgment as to Plaintiff's unlawful search and seizure claims under § 1983 and the NJCRA.

### C.  The Malicious Prosecution Claims (Counts 4 & 11)

"To prove malicious prosecution under section 1983, a plaintiff must show that: (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Estate of Smith*, 318 F.3d at 521 (citing *Donahue v. Gavin*, 280 F.3d 371, 379–80 (3d Cir. 2002). "Malicious prosecution differs from false arrest inasmuch as '[a] claim for false arrest, unlike a claim for malicious prosecution, covers damages only for the time of detention until the issuance of process or arraignment, and not more.'" *Johnson v. Knorr*, 477 F.3d 75, 82 (3d Cir. 2007) (quoting *Montgomery v. De Simone,* 159 F.3d 120, 126 (3d Cir.1998)).  Importantly, the "existence of probable cause is an express element of the claim for malicious prosecution."  *Johnson v. Provenzano*, No. 12-1253, 2014 WL 7011545, at *10 (D.N.J. Dec. 11, 2014).

Plaintiff asserts that Det. O'Connor and Sgt. Crocco are liable for malicious prosecution because both "influenced, facilitated, and/or participated in the decision to institute criminal

proceedings against [him]" through their communications with Assistant Prosecutor LaMountain and testimony provided to Judge Jorgensen.  Pl. Opp'n 39.   However, because Plaintiff has failed to raise a genuine dispute of material fact regarding whether his arrest was supported by probable cause, *see supra*, Plaintiff's claim for malicious prosecution fails.  *See Estate of Smith*, 318 F.3d at 522 (finding "summary judgment in favor of the defendants was appropriate" because "based on the information available to officers at the time the warrant was sought, there was probable cause for arrest").   Defendants are therefore entitled to summary judgment with respect to Plaintiff's claims for malicious prosecution under § 1983 and the NJCRA.

### D.   The Excessive Force Claims (Counts 2 & 9)

"To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a seizure occurred and that it was unreasonable." *See Estate of Smith*, 318 F.3d at 515 (citation omitted).  There is no question that a seizure occurred as a result of Plaintiff's arrest, thus the only question for the Court is whether the force used to effect the breach of Plaintiff's residence and his subsequent arrest was reasonable.

In determining reasonableness with respect to the use of force, courts ask whether "the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations." *Graham v. Connor*, 490 U.S. 386, 397 (1989); *see Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004) ("[I]f a use of force is objectively reasonable, an officer's good faith is irrelevant and any bad faith motivation on his part is immaterial.").  "[T]he absence of physical injury [does not] necessarily signif[y] that the force has not been excessive, although the fact that the physical force applied was of such an extent as to lead to injury is indeed a relevant factor to be considered as part of the totality." *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997).  Other factors to consider include: (1) the severity of the crime;

(2) whether the suspect poses an immediate threat to the safety of the officers or others; (3) whether the suspect is resisting arrest or fleeing; (4) the possibility that persons subject to the police action are themselves violation or dangerous; (5) the duration of the action; (6) whether officers are effecting an arrest; (7) the possibility that the suspect may be armed; and (8) the number of persons with whom the officers are contending. *Graham*, 490 U.S. at 396; *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997).

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S.at 397.  Thus, "a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. Summary judgment is appropriate "if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Estate of Smith*, 318 F.3d at 516 (internal quotation marks and citation omitted).

Here, Plaintiff specifically challenges the decision to deploy the Hamilton SWAT Team, led by Captain Stevens, to execute the search warrant and arrest at Plaintiff's residence.  Pl. Opp'n 45.  Plaintiff contends that the SWAT Team knew very little about his activity inside the residence and that there were no indicia that he had fortified the apartment, that he was armed, or that he had any other outstanding warrants aside from the hindering charge.  Pl. Opp'n 45.  However, Plaintiff's version of events overlooks that, from law enforcement's perspective, Plaintiff had become a suspect in a rapidly evolving murder investigation and had refused to respond to officers' various attempts to make contact.

Under the totality of the circumstances, the use of the Hamilton SWAT Team and officers' arrest of Plaintiff was objectively reasonable.  Looking to the *Sharrar* factors enumerated by the Third Circuit as guidance, the Court finds that the following facts weigh in favor of the reasonableness of the force employed.  First, Plaintiff was being investigated for a murder in which the victim was brutally stabbed numerous times, and he had been charged with hindering that investigation.  Second, officers were unsure whether Plaintiff was armed or could pose a safety risk.  Third, Plaintiff had avoided making contact with officers for approximately two hours. Fourth, Plaintiff had recently been arrested for domestic violence, and officers were aware of that arrest prior to the use of the SWAT team.  Hamilton Facts ¶ 22. Fifth, Plaintiff was placed in handcuffs within seconds of the SWAT Team breaching his apartment and, at that point, officers no longer pointed their firearms at Plaintiff.  Finally, Plaintiff does not allege he was physically injured.  *See* Hamilton Facts ¶ 31, Ex. L 175:1–9.  Thus, law enforcement's use of the SWAT team and its conduct "does not rise to a Fourth Amendment violation."  *Sharrar*, 128 F.3d at 822 (finding use of SWAT team and its conduct reasonable where one of the suspects had recently "used a gun" to inflict blunt-force trauma and there was "no allegation that the requirement that the suspects lie down extended beyond the time necessary to handcuff them and secure them"); *see also Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1183, 1191 (10th Cir. 2011) (finding decision to use SWAT team reasonable to effectuate search and arrest warrants related to misdemeanor assault charges where "[t]here existed the possibility of an altercation" and law enforcement's "goal was to effect the arrest and search warrant quickly, without injury, and to preserve evidence"); *Santistevan v. City of Colorado Springs*, 983 F. Supp. 2d 1295, 1319 (D. Col. 2013) (finding use of SWAT team reasonable where search warrant "sought evidence of felony drug distribution").

Nevertheless, Plaintiff emphasizes that he experienced severe stress and anxiety as a result of the forced entry by the SWAT Team.  But, without more, this does not raise a constitutional violation.  The Third Circuit has advised that "extreme methods used in effectuating arrests" are not necessarily "constitutionally excessive," even if the methods used cause "discomfort and humiliation." *Sharrar*, 128 F.3d at 821.  With respect to the deployment of SWAT teams in particular, the Third Circuit has stated:

> The decision to deploy a SWAT team to execute a warrant necessarily involves the decision to make an overwhelming show of force-force far greater than that normally applied in police encounters with citizens. Indeed, it is the SWAT team's extraordinary and overwhelming show of force that makes 'dynamic entry' a viable law enforcement tactic in dealing with difficult and dangerous situations....
> ….
>
> The 'SWAT' designation does not grant license to law enforcement officers to abuse suspects or bystanders, or to vent in an unprofessional manner their own pent-up aggression, personal frustration or animosity toward others. If anything, the special circumstances and greater risks that warrant 'dynamic entry' by a SWAT team call for more discipline, control, mindfulness, and restraint on the part of law enforcement, not less. SWAT officers are specially trained and equipped to deal with a variety of difficult situations, including those requiring a swift and overwhelming show of force. At all times, SWAT officers no less than others—dressed in camouflage or not-must keep it clearly in mind that we are not at war with our own people.

*Estate of Smith*, 318 F.3d at 517–18 (quoting *Holland v. Harrington*, 268 F.3d 1179, 1190–95 (10th Cir. 2001).  While Plaintiff was understandably shaken by the breach of his apartment and the SWAT Team's overwhelming show of force, it was Plaintiff's own avoidance of law enforcement that escalated the encounter into a "difficult and dangerous situation[]"—one in which, from perspective of the officers on the scene, a murder suspect was concealed within the apartment.  The SWAT Team's quick apprehension of Plaintiff and rapid de-escalation of the situation once he was in custody further support the reasonableness of the force used.

"[I]n the face of [a] motion for summary judgment, a § 1983 plaintiff must produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial." *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 291 (3d Cir. 2018).   Plaintiff identifies Defendants Stevens, Murphy, Embley, Mattis, Woodhead, King, Schuster, and Horan as the Hamilton police officers who allegedly used excessive force.  Pl. Opp'n 49.   For the reasons set forth above, these Defendants are entitled to summary judgment on Plaintiff's excessive force claims.   All the remaining Defendants are entitled to summary judgment as to the excessive force claims as Plaintiff was "unable to satisfy § 1983's personal-responsibility requirement."  *Id.* (citation omitted).

### E.  Plaintiff's State Law Claims Under the NJTCA (Counts 8, 9, 10, & 11)

Under the same theories of liability as Plaintiff's § 1983 and NJCRA claims, Plaintiff also asserts claims under the NJTCA.   The NJTCA, N.J.S.A. 59:1-1 *et seq.*, governs state law tort claims against public employees and entities in New Jersey.   *See Castro v. New Jersey*, 521 F. Supp. 3d 509, 525 (D.N.J. 2021).  As set forth *supra*, Plaintiff has failed to prove liability under the § 1983 and NJCRA claims alleged in the Second Amended Complaint.   Plaintiff's state common law claims for false arrest, false imprisonment, and malicious prosecution fail for the same reasons.  Plaintiff does not assert, and the Court cannot construe, any other cognizable state law tort claims arising from the alleged conduct, particularly since Plaintiff voluntarily dismissed claims for negligence and intentional infliction of emotion distress.  ECF No. 144.  Because all state common law claims are dismissed, the Court need not address the immunities asserted by Defendants under the NJTCA.

### F.  Plaintiff's Detention and the Delayed Dismissal of the Criminal Charge

While the Court finds that summary judgment is appropriate on the present record under Plaintiff's pleaded theories of liability, two additional issues warrant further clarification.

First, Plaintiff emphasizes that he was detained for nearly ten days and argues that any probable cause for such detention had dissipated well before his release on February 9, 2015.  Pl. Opp'n 63.  I disagree.  On February 5, 2015, detectives had applied for two CDWs, one seeking the phone records of Adison Trigueno and one seeking Plaintiff's.  Carteret Facts Ex. A. Detectives did not receive the results of the CDWs, which indicated that Plaintiff was not in the area at the time of Mocci's murder, until February 9, 2015, the day that Plaintiff was released from jail.  Carteret Facts Ex. C.

Second, Defendants mistakenly maintain that the hindering charge brought against Plaintiff was dismissed on February 9, 2015, upon his release from jail on his own recognizance.  Carteret Facts ¶ 68; MCPO Facts ¶ 40.  But, the criminal charge against Plaintiff was not dismissed until November 2, 2015, despite the fact that any probable cause that had initially supported the charge had apparently dissipated upon his release on February 9, 2015.  *See* Schwartz Cert Ex. 30, 45. Neither party addresses the legal implications of these allegations.  However, it would appear that this delay may be actionable.  *Cf. Gallo v. City of Philadelphia*, 161 F.3d 217, 223 (3d Cir. 1998) (explaining that the obligation "to go to court and answer charges" amounts to a "seizure" as "mandatory attendance at court hearings does retrain liberty").  But Plaintiff does not set forth any independent theory of liability arising from the failure to dismiss the criminal charge in his Complaint—indeed, the focus of Plaintiff's allegations, in the Complaint as well as his briefing, is on his arrest and the search of his residence.  More importantly, Plaintiff does not name a proper defendant against whom any such claim could be brought, even after a lengthy period of discovery

revealing the prosecutors responsible for the charge.  Because Plaintiff has not properly asserted this claim, and because this is the summary judgment stage, Plaintiff cannot recover under this theory of liability.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, Defendants' motions for summary judgment are **GRANTED**.  An appropriate Order shall follow.

DATE: September 15, 2022

/s/ Freda L.  Wolfson<br>Freda L.  Wolfson<br>U.S. Chief District Judge